UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                  :

SHELDON STONE, AS TRUSTEE OF THE STONE  :
FAMILY TRUST,                                 :

                        Petitioner,       :

                                  :

                v.                    :

                                  :

THEATRICAL INVESTMENT CORP. and JON    :
PLATT,                                     :

                      Respondents.    :

------------------------------------------------------------------------X

14 Civ. 6494 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/2/2014

PAUL A. ENGELMAYER, District Judge:

    Sheldon Stone petitions here on behalf of the Stone Family Trust ("SFT") to confirm an
arbitration award pursuant to § 9 of the Federal Arbitration Act ("FAA" or "Act"), 9 U.S.C. § 1
*et seq.* Respondents Jon Platt and Theatrical Investment Corp. (collectively, "TIC") oppose the
petition and cross-move to vacate the arbitration award under § 10 of the FAA. For the
following reasons, SFT's petition to confirm the arbitration award is granted, and TIC's cross-
petition to vacate the award is denied.

## I.   Background

### A.   Factual Background[1]

    On June 1, 2009, SFT and TIC entered into a joint venture agreement to invest in
theatrical productions. SFT Decl. Ex. A, TIC Decl. Ex. 6 ("Agreement"). Jon Platt signed the

---

[1] These facts are drawn from the Petition to Confirm Arbitration Award, Dkt. 2 ("Petition"), the
Cross-Petition to Vacate Arbitral Awards, Dkt. 12 ("Cross-Petition"), and the exhibits attached
to the various declarations filed by the parties, Dkt. 6 ("SFT Decl."), Dkt. 14 ("TIC Decl."), Dkt.
20 ("SFT Reply Decl."), and Dkt. 22 ("TIC Reply Decl.").

Agreement in his capacity as TIC's President and sole shareholder; Sheldon Stone signed it in his capacity as a Trustee acting on behalf of SFT.  *See id.* at p. 4.  Under the Agreement, each party was directed to make an initial capital contribution of $700,000 to finance Broadway shows, off-Broadway productions, and national tours of various plays.  *Id.* §§ 1, 3(a).  Between the creation of the joint venture in 2009 and its termination in 2011, SFT made total capital contributions of $1.66 million.  Petition ¶ 14.  These capital contributions were to be returned, and any profits obtained from the joint venture's investments were to be distributed to the parties, according to a formula set out in the Agreement.  *See* Agreement § 3(b).  The Agreement also provided that it would remain in effect until either party terminated it in writing.  *Id.*

To resolve any disputes, the parties agreed to submit to "arbitration before a single arbitrator in New York City, pursuant to the then-existing rules of the American Arbitration Association," and to accept "[a]ny award rendered" as "final and conclusive."  *Id.* § 7.  The parties also agreed that the "Agreement shall be governed by and construed in accordance with the laws of the State of New York."  *Id.* § 8.

Pursuant to the Agreement, the joint venture invested in various productions including *The Book of Mormon*, "one of Broadway's biggest hits," and *Enron*, which was not a success.  Petition ¶ 15; Cross-Petition ¶¶ 12–13 & n.3–4.  SFT alleges that TIC received millions of dollars in capital returns and profit distributions from the joint venture's investments, yet failed to pay anything to SFT.  Petition ¶ 16.  SFT further alleges that TIC breached the Agreement by comingling funds, failing to maintain proper records, and claiming joint venture expenses as tax deductions for Platt's personal company.  *Id.* ¶ 17.  TIC disputes these allegations; however, it agrees that the relationship between the parties "began to sour" in 2011.  Cross-Petition ¶ 11.  On

December 22, 2011, SFT terminated the joint venture and demanded that TIC immediately return all funds the joint venture owed to SFT.  *Id.*

### B.    Arbitration

On February 22, 2012, SFT served a Demand for Arbitration on TIC.  Petition ¶ 19.  The demand sought, *inter alia*, an accounting of SFT's interest in the joint venture and full payment of SFT's share of returned capital and proceeds.  SFT Decl. Ex. B ("Demand for Arbitration"). Laverne Y. Berry, Esq. was thereafter appointed as the arbitrator.  Petition ¶ 20.  Over the next year and a half, the parties participated in extensive discovery and pre-hearing proceedings, which included production of more than 7,000 pages of documents.  *Id.* ¶ 21.

On January 25, 2013, while discovery was ongoing, Berry held a preliminary hearing. *See* TIC Decl. Ex. 4 ("Order #5").  Counsel for both parties attended.  *Id.*  On February 1, 2013, Berry issued an order following up on that hearing.  *Id.*  The order directed SFT to provide Berry with "an updated list of all theatrical productions, which [SFT] claims are covered under the Joint Venture Agreement," *id.* ¶ 2, and directed TIC to provide SFT with quarterly "distribution statements and payments due" for the productions identified by SFT, *id.* ¶ 5.  It also invited the parties to request an additional preliminary hearing.  *Id.* ¶ 1.

Between October 22 and 25, 2013, following additional discovery, Berry conducted a final hearing.  Petition ¶ 22.  The hearing included the presentation of substantial documentary evidence and live testimony from witnesses, including representatives of each party, accountants for each side, and an expert on theater investments.  *Id.*

Soon after, on November 5, 2013, Berry issued an interim order that again directed TIC to provide SFT with a "quarterly accounting . . . accompanied by payments of any amounts due" for the 14 shows identified by SFT.  TIC Decl. Ex. 5 ("Order #12"), at ¶¶ 1–2.  However, Berry

stated that "this order for accounting and payments should not be construed to suggest that there has been a final decision on which shows are part of the joint venture." *Id.* ¶ 2.

On February 28, 2014, Berry issued the first Partial Final Award.  SFT Decl. Ex. C, TIC Decl. Ex. 7 ("February 28 Award").  Because neither party had requested a "reasoned award," Petition ¶ 23, Berry set out the relief she was awarding but did not explain the reasoning underlying her decisions.  The Award directed TIC and Platt, "jointly and severally," to pay SFT $911,694 plus pre-judgment interest.  February 28 Award §§ 1(a)–(b).  In calculating this figure, Berry stated that she "assume[d]" that TIC incurred $98,847 in expenses and earned a priority payment of 20% of all revenues received.  *Id.* § 1(a).  Berry also included a list of 14 "Authorized Joint Venture Shows," the same 14 shows SFT had identified in February 2013. *See id.* Ex. A.  The Award further directed TIC and Platt to "notify the producer[s] of all of the [14] shows" that a specified percentage of future distributions "shall be paid directly to" SFT. *Id.* § 2(a).  If TIC and Platt were "unable to secure the consent of any producer," they were directed to forward any distributions "in their entirety to an independent receiver to be appointed by the Arbitrator for distribution in the proper proportions." *Id.* § 2(c).  Berry retained jurisdiction over the matter in order to (a) review SFT's calculation of pre-judgment interest, and (b) "secur[e] an independent receiver, if necessary, for all future distributions." *Id.* § 3.

On May 23, 2014, Berry issued the second Partial Final Award.  SFT Decl. Ex. D, TIC Decl. Ex. 8 ("May 23 Award").  In addition to reiterating the provisions of the February 28 Award, the May 23 Award included five significant modifications.  First, Berry credited TIC for payments it had made to SFT, reducing the amount owed from $911,694 to $307,388.54. *Id.* § 1(a).  Second, Berry awarded pre-judgment interest in the amount of $211,493.43, with post-judgment interest to accrue at nine percent per year. *Id.* §§ 1(c)–(d).  Third, Berry established

procedures for future distributions from *The Book of Mormon*, the only "Authorized Show" that was continuing to generate revenue.  *Id.* §§ 2(a)–(c).  Berry defined *The Book of Mormon* to include *The Book of Mormon on Broadway* and *The Jumamosi Tour LP*, a national tour of the production.  *Id.* § 2(a).  Because the producers declined to make payments directly to SFT, Berry directed the parties either to "agree upon and secure a third-party collection agent or receiver" or to each submit "three (3) potential receivers" for Berry to choose from.  *Id.* § 2(b).  Fourth, to address TIC's concerns about the potential costs of administering future distributions, *see* SFT Reply Decl. Ex. 3, at 5–6, Berry established a $5,000-per-year floor for TIC's priority payments. *Id.* § 2(c).  Fifth, although the February 28 Award had directed TIC to bear the costs of arbitration, the May 23 Award stated that the arbitration costs "shall be borne equally by the parties."  *Id.* § 2(d).

On June 23, 2014, Berry issued a Final Award.  SFT Decl. Ex. E, TIC Decl. Ex. 9 ("June 23 Award").  The June 23 Award stated that "Thomas Cyrana, Managing Director and Principal of The RZO Companies, is appointed as Receiver to receive all future distributions to the Parties as the result of royalties paid by third-parties for the Authorized Shows."  *Id.*  It also set out the formula for allocating future distributions to each party.  *Id.*

Finally, on August 11, 2014, Berry issued a "Disposition for Application of Modification of Second Partial Final Award of Arbitrator."  SFT Decl. Ex. F, TIC Decl. Ex. 10 ("August 11 Award").  She noted that this award was "an effort to consolidate the determinations previously set forth" in the February 28, May 23, and June 23 Awards and to clear up "some confusion on the part of the parties."  *Id.* § 1 n.1.  The Award reiterated the provisions contained in the prior Awards.  It clarified that:

> The receiver's duties shall be limited to: (i) receiving Post-Recoupment Distributions, either directly from companies associated with The Book of Mormon

or from Respondents, jointly and severally, and (ii) reviewing any profit-sharing statements supplied by companies. The receiver[] shall have the authority to request back-up documentation sufficient to understand the payments from companies associated with The Book of Mormon and to share this information with all Parties. Any receiver shall not have the authority to audit The Book of Mormon companies.

*Id.* § 2(b). The Award also stated that, "so as not to burden Receiver, and so as not to incur undue administration costs, the Receiver shall have the right to make distributions to [SFT] on a quarterly basis." *Id.* § 2(e).

SFT alleges that TIC has "refused to pay any sums due under the award." Petition ¶ 27. TIC, by contrast, alleges that it has paid SFT $2,218,776.61 in response to the arbitrator's various orders. Cross-Petition ¶ 2.

### C.    Procedural History of this Action

On August 14, 2014, SFT filed the Petition, along with a supporting memorandum of law and declaration. Dkt. 2 ("Petition"), 5 ("SFT Br."), 6 ("SFT Decl."). The Petition seeks confirmation of the arbitration award, and an award of costs and fees incurred in this action. Petition p. 7.

On September 11, 2014, TIC filed the Cross-Petition, along with a supporting memorandum of law and declaration. Dkt. 12 ("Cross-Petition"), 13 ("TIC Br."), 14 ("TIC Decl."). The Cross-Petition raises numerous challenges to the arbitration award: It argues that the arbitrator exceeded her powers, manifestly ignored the applicable law and contract terms, violated the requirements of due process, and was biased. Cross-Petition ¶¶ 14–27. It therefore seeks an order vacating the arbitration award, entering judgment in favor of TIC, and directing SFT to reimburse the full amount TIC claims it has paid to SFT, plus interest and the costs and fees incurred in this action. *Id.* p. 12.

On October 9, 2014, SFT filed its Answer to the Cross-Petition, Dkt. 18, and its reply in support of the Petition, Dkt. 19 ("SFT Reply Br."), 20 ("SFT Reply Decl."). On October 30, 2014, TIC submitted its reply in support of the Cross-Petition. Dkt. 21 ("TIC Reply Br."), 22 ("TIC Reply Decl.").

On November 7, 2014, the Court heard argument. *See* Dkt. 23 ("Tr.").

## II.   Applicable Legal Standards

Under the FAA, a federal district court reviewing an arbitration award "can confirm and/or vacate the award, either in whole or in part." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006). However, judicial review of arbitration awards is "'severely limited,' so as not to frustrate the 'twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (citations omitted). The reviewing court owes "strong deference" to "arbitral awards and the arbitral process," *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007), and so a party seeking to vacate an arbitration award "must clear a high hurdle," *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 671 (2010). "It is not enough for petitioners to show that the panel committed an error—or even a serious error." *Id.*

Indeed, "[i]f there is 'even a barely colorable justification for the outcome reached,' the court must confirm the arbitration award." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13 (2d Cir. 1997) (quoting *Matter of Andros Compania Maritima, S.A.*, 579 F.2d 691, 704 (2d Cir. 1978)). Courts have authority to vacate arbitration awards only in certain narrow, enumerated circumstances, such as "where there was evident partiality or corruption in the arbitrators" or "where the arbitrators exceeded their powers, or so

imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10.

## III.    Discussion

TIC raises several challenges to the award.  Specifically, it claims that: (a) the parties to the arbitration were improper; (b) the arbitrator was biased; (c) the arbitrator violated due process by prejudging a critical issue of disputed fact; (d) the arbitrator manifestly disregarded the law and evidence in interpreting the parties' Agreement; and (e) the arbitrator exceeded her powers by appointing a receiver.  The Court addresses each argument in turn.

### A.    The Parties to the Arbitration

#### 1.    Platt

The arbitrator treated Platt, the president and sole shareholder of TIC, as a party to the arbitration and held him jointly and severally liable for the full amount she awarded to SFT.  *See, e.g.*, August 11 Award.  TIC contends that this aspect of the arbitrator's decision contravenes New York law[2] because Platt was not a party to the Agreement and should not have been held individually liable for any breach of contract by TIC.  TIC Br. 11–12.

To the extent this argument asserts that the arbitrator "improperly asserted jurisdiction over Platt," TIC Br. 12, it is waived.  During the arbitration process, Platt did not object to the arbitrator's exercise of jurisdiction over him; TIC and Platt contended only that "all claims against Mr. Platt should be dismissed" because "[c]orporate officers are not individually liable for their company's breach of contract."  TIC Decl. Ex. 13 ("November 22, 2013 Letter Br."), at 22.  At the same time, Platt participated fully in the arbitration and even demanded individual

---

[2] As noted, the parties agreed that the joint venture would be "governed by and construed in accordance with the laws of the State of New York."  Agreement § 8.

relief. *See* TIC Decl. Ex. 11 ("TIC Pre-Hearing Br."), at 12–13 ("Mr. Platt has a right to reimbursement of roughly $4.2 million in out of pocket expenses."). Platt therefore waived his right to object to the arbitrator's jurisdiction over him. *See, e.g.*, *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003); *Data-Stream AS/RS Technologies, LLC v. China Int'l Marine Containers, Ltd.*, No. 02 Civ. 6530 (JFK), 2003 WL 22519456, at *3 (S.D.N.Y. Nov. 6, 2003) ("By participating in the arbitration, [Respondent] effectively waived its right to claim that it should not be a party to the arbitration.").

To the extent this argument asserts that Berry improperly pierced TIC's corporate veil, TIC Br. 12 n.9, it is unpersuasive. "New York law requires the party seeking to pierce a corporate veil to make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (citing *Morris v. N.Y. State Dep't of Taxation & Fin.*, 603 N.Y.S.2d 807, 810–11 (1993)).

To "identify a dominated corporation," the first prong of the veil-piercing inquiry, courts apply a 10-factor test.[3] *Id.* (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)). On the record before the Court, there is insufficient evidence to evaluate each element. However, at least some factors unambiguously support finding this

---

[3] The factors are: "(1) whether corporate formalities are observed, (2) whether the capitalization is adequate, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) whether there is overlap in ownership, officers, directors, and personnel, (5) whether the corporate entities share common office space, address and telephone numbers, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the alleged dominator deals with the dominated corporation at arms length, (8) whether the corporation is treated as an independent profit center, (9) whether others pay or guarantee debts of the dominated corporation, and (10) whether the corporation in question had property that was used by the alleged dominator as if it were the dominator's own." *Id.*

prong of the veil-piercing test satisfied.  For example, there is complete overlap in TIC's ownership, officers, directors, and personnel (factor four) in that Platt is TIC's sole owner, officer, director, and employee.  Petition ¶ 7.  For the same reason, TIC could not have exercised business discretion independent of Platt (factor six).  Likewise, if, as proffered, there was evidence to substantiate SFT's claim that Platt controlled TIC's finances and shifted funds among various entities, *see* Petition ¶ 17; SFT Reply Br. 16, Platt could have used corporate funds for personal purposes (factor three), may have used other funds to pay TIC's debts (factor nine), and presumably would not have regarded TIC as an independent profit center (factor eight).  As to the second prong of the veil-piercing inquiry, there is no question that Platt used his control over TIC to commit the alleged wrongdoing, namely, failing to pay distributions to SFT. The arbitrator therefore had more than a "barely colorable justification" for piercing the corporate veil and holding both TIC and Platt jointly and severally liable for the damages she awarded.  *See Willemijn*, 103 F.3d at 13.

Tellingly, TIC does not challenge the adequacy of the evidence as to either prong of the veil-piercing inquiry.  Rather, TIC asserts that "[t]he arbitrator made no findings to support piercing the corporate veil."  TIC Br. 12 n.9.  This statement, although literally true, is irrelevant; the parties did not request, and the arbitrator did not make, *any* formal findings.  *See* Petition ¶ 23.

Providing further support for the arbitrator's decision to pierce the corporate veil, TIC and Platt jointly submitted a single pre-hearing brief, which discussed the two entities interchangeably.  *See, e.g.*, TIC Pre-Hearing Br. 2 ("The [Agreement] unequivocally states that *TIC* 'shall have the right to make all decisions regarding the joint venture . . . .'  Mr. Stone even acknowledged *Mr. Platt's* authority to commit the joint venture to investment decisions on

several occasions.") (emphasis added).  Platt maintained this position as long as it furthered his case before the arbitrator, and abandoned it only to limit his exposure in the event he received an adverse decision.  *See* November 22, 2013 Letter Br. 22.  Accordingly, Platt's role in the arbitration does not provide a basis for vacating the award.

### 2.      SFT

TIC next contends that SFT was an improper party to the arbitration because a trust cannot sue on its own behalf.  TIC Br. 13–14.  Under New York law, a trust may not bring a lawsuit; a trustee must bring suit on behalf of the trust.  *In re Vebeliunas*, 252 B.R. 878, 887 (S.D.N.Y. 2000) (citing, *inter alia*, *Fiduciary Co., Ltd. v. Micro–Therapeutics, Inc.*, 442 N.Y.S.2d 58, 59 (App. Div. 1981)).  A trust may, however, initiate and participate in arbitration on its own behalf.  *See, e.g.*, *Allstate Ins. Co. v. N.Y. Petroleum Ass'n Comp. Trust*, 961 N.Y.S.2d 218, 219 (App. Div. 2013) (confirming arbitration award against a trust); *In re Domansky*, 770 N.Y.S.2d 288, 290 (App. Div. 2003) (affirming lower court's grant of trust's motion to compel arbitration).  SFT has therefore done exactly what New York law requires:  After SFT, a party to the Agreement, arbitrated on its own behalf, Stone, in his capacity as trustee for SFT, filed suit to confirm the arbitration award.

### B.      The Arbitrator's Neutrality

The FAA permits federal district courts to vacate arbitration awards "where there was evident partiality or corruption."  9 U.S.C. § 10(a)(2).  Evident partiality means that "'a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.'"  *Scandinavian Reins. Co.*, 668 F.3d at 72 (quoting *Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 84 (2d Cir. 1984)).  "The burden of proving evident partiality 'rests upon the party asserting bias,'" *id.* (quoting *Andros Compania*

*Mairitima*, 579 F.2d at 700), and the "showing of evident partiality 'may not be based simply on speculation,'" *id.* (quoting *United States v. Int'l Bhd. of Teamsters*, 170 F.3d 136, 147 (2d Cir. 1999)).  Applying this standard, courts have found evident partiality where, for example, "an arbitrator fails to disclose a relationship or interest that is strongly suggestive of bias in favor of one of the parties."  *Id.* (citing *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 136 (2d Cir. 2007)).

Here, TIC argues that the arbitrator was biased because she "asserted jurisdiction over Mr. Platt," "adopted SFT's self-selected list of shows," "effectively rewrote express provision of the [Agreement] for SFT's benefit, and "made improper substantive modifications to her issued awards to benefit SFT"—in other words, because she found for SFT on a number of issues.  TIC. Br. 24.  TIC contends that each decision in favor of SFT was so "erroneous" that the arbitration must have been "infected with partiality."  *Id.*  As discussed in the balance of this Opinion, the arbitrator had ample evidence to support her decisions.  Further, even assuming her decisions were erroneous, TIC has identified no basis whatsoever to infer partiality.  At most, TIC's claims of error sound in carelessness or honest mistake.  Because TIC's claim of partiality is based in "pure speculation," it "does not rise to the level of evidence required to show that a reasonable person would *have* to conclude that [the arbitrator] was partial."  *Companion Prop. & Cas. Ins. Co. v. Allied Provident Ins., Inc.*, No. 13 Civ. 7865 (AJN), 2014 WL 4804466, at *12 (S.D.N.Y. Sept. 26, 2014) (citing *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013)).

TIC's argument also ignores the fact that the arbitrator made various decisions in its favor.  For example, Berry denied SFT's request to put all disputed funds in an escrow account. *See* Order #5 ¶ 5.  Additionally, in response to TIC's concerns about the cost of managing future

distributions, she created a $5,000-per-year floor for TIC's share of those distributions.  *See* May 23 Award § 2(c); August 11 Award § 2(c).  She also reversed her initial decision that TIC would bear the costs of arbitration, *see* February 28 Award § 4, and instead ordered the parties to split the costs equally, *see* August 11 Award § 2(e).  She even entertained significant post-award briefing urging her to reconsider her decisions, *see, e.g.*, TIC Decl. Exs. 12, 15, and issued a modified award in response, *see* August 11 Award.  An arbitrator partial to SFT presumably would not have given TIC a second (and third) bite at the apple.  Thus, these and other decisions favorable to TIC belie the notion that the arbitrator was partial to SFT.

> ## C.    Due Process

TIC next contends that the arbitrator violated its "fundamental due process rights" by prejudging a "key merits issue" before respondents had "a fair chance to present their case."  TIC Br. 22.  Specifically, Order #5 directed SFT to identify a list of theatrical productions that it claimed were covered by the Agreement.  Order #5 ¶ 2.  SFT identified 14 such shows, and Order #12 directed TIC to provide a quarterly accounting and payment of amounts due for those 14 shows.  Order #12 ¶¶ 1–2.  According to TIC, the arbitrator had "refus[ed] to hear 'pertinent and material evidence,'" TIC Br. 22 (citation omitted), and "fail[ed] to permit Respondents to present their case before the issue was decided," *id.* at 23.

A cursory glance at the underlying facts reveals the false and misleading nature of TIC's account.  By the time Berry issued Order #12 on November 13, 2013, she had already held a preliminary hearing, received pre-hearing briefs, and conducted a four-day final hearing.  Although the parties had not yet submitted their post-hearing briefs, TIC had been given ample opportunities to present its case through written briefing, documentary evidence, witness testimony, and opening and closing arguments.  *See, e.g.*, Petition ¶ 22.  Further, TIC has offered

no support for the bald assertion that Berry refused to hear or consider any evidence that TIC sought to present.  Accordingly, even if the Court accepted TIC's claim that Order #12 was a final award disguised as an interim order, there would be no basis to find a violation of TIC's due process rights.  *See, e.g.*, *Kolel Beth*, 729 F.3d at 107 ("'[A]lthough [he] is not required to hear all the evidence proffered by a party, an arbitrator must give each of the parties to a dispute an adequate opportunity to present its evidence and argument.'" (quoting *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (alterations in original)).

Moreover, TIC's characterization of Order #12 as a final award is flawed.  The order explicitly states that "this order for accounting and payments should not be construed to suggest that there has been a final decision on which shows are part of the joint venture."  Order #12 ¶ 2.  That Berry's final awards ultimately aligned with her interim order does not suggest that she failed to consider the post-hearing briefing or to continue evaluating the evidence presented at and before the final hearing.  Accordingly, TIC has presented no non-speculative basis for concluding that Berry prejudged this issue and violated the requirements of due process.

### D.     The Arbitrator's Interpretation of the Agreement

As noted, "even a serious error" does not provide a basis for vacating an arbitration award.  *Stolt-Nielsen S.A.*, 559 U.S. at 671.  As long as the arbitrator was "even arguably construing or applying the contract," the Court must confirm the award.  *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *see also Trustees of N.Y. State Nurses Ass'n Pension Plan v. Cabrini Med. Ctr.*, 353 F. App'x 528, 531 (2d Cir. 2009) ("[A] court may 'not reverse an arbitral award that draws its essence from the agreement, even if it contains factual errors or erroneous interpretations of contract provisions.'") (citation omitted).

14

Although conceding that "mere errors of interpretation will not suffice to turn over an award," TIC argues that the arbitrator "wholly ignored, and thereby functionally eviscerated certain key terms" in the Agreement.  TIC Br. 16 n.14.  Specifically, TIC argues that the arbitrator blatantly disregarded the contract terms in evaluating (1) which shows were covered by the Agreement, (2) the amount of expenses TIC had incurred, and (3) whether future expenses should be deducted from TIC's "priority payment."  *Id.* 14–16.

As a threshold matter, the Court notes that the four-page Agreement is far from comprehensive and does not unambiguously answer every question put to the arbitrator.  The three issues TIC now raises were vigorously contested during the arbitration, and both parties provided extrinsic evidence to aid the arbitrator in interpreting the contract.  *See, e.g.*, TIC Pre-Hearing Br. 2 (discussing "[t]he parties' course of dealing"); SFT Reply Decl. Ex. 1 ("SFT Pre-Hearing Br."), at 6 (discussing accounting statements provided by TIC).  Despite the brevity of the Agreement and of the arbitrator's awards, the awards contain several references to the Agreement:  For example, the arbitrator began each of the four awards by noting that she was "designated in accordance with the Arbitration Agreement entered into by the above-named Parties and dated as of June 1, 2009."  She also adopted the language of the Agreement, discussing TIC's "priority payment" and the parties' "capital contributions."  *See, e.g.*, February 28 Award §§ 1(a), 2(d).  The Court therefore infers that the arbitrator construed and applied the Agreement in reaching her decisions.  *Cf. Cabrini Med. Ctr.*, 353 Fed. App'x at 531 (where arbitrator ruled that a party "'had an obligation *under the Trust Agreement*,'" the award could not be considered "so untethered from the Trust Agreement that it must be vacated").

A closer examination of the Agreement reinforces the conclusion that Berry was at least "arguably construing or applying the contract" in resolving each of the three issues TIC now

raises. *United Paperworkers Int'l Union*, 484 U.S. at 38. First, relevant to the shows covered by the Agreement, the Agreement stated only that "TICorp shall have the right to make all decisions regarding the Joint Venture including, without limitation, all decisions regarding the making and management of any investments in productions made by the Joint Venture." Agreement § 4. This provision sheds no light on which shows TIC actually invested in on behalf of the joint venture. During the arbitration, SFT consistently identified 14 "authorized shows." *See, e.g.*, SFT Pre-Hearing Br. 7; SFT Reply Decl. Ex. 2 ("SFT Post-Hearing Br."), at 9. Meanwhile, TIC fluctuated from a minimum of 10 to a maximum of 28 shows that it asserted were covered by the Agreement. *See* SFT Reply Br. 5 n.7 (citing TIC Decl. Ex. 11, 13). And now, for purposes of this litigation, TIC claims that the Agreement covered 25 shows. *See* TIC Br. 1. TIC's shifting position confirms that this issue could not be conclusively resolved within the four corners of the Agreement. The resolution of this hotly disputed factual issue therefore turned on extrinsic evidence, and the evidence SFT submitted to the arbitrator—namely, accounting statements generated by TIC—provided "a ground for the arbitrator's decision." *D.H. Blair*, 462 F.3d at 110 (citation omitted). That is all the FAA requires.[4]

Second, as to the expenses TIC incurred, the Agreement is equally inconclusive. The Agreement explains that any distributions "shall be applied, first, to the payment of any out of pocket expenses incurred by the Joint Venture," but it does not identify the expenses actually incurred or define which expenses TIC may attribute to the joint venture. Agreement § 3(b).

---

[4] TIC's challenge to the arbitrator's decision to include *The Jumamosi Tour LP* as part of *The Book of Mormon* production is similarly unavailing. The Agreement authorizes investment in Broadway productions and national tours but is silent as to the particular shows or tours in which the joint venture in fact invested. *See* Agreement § 1. Accordingly, the arbitrator turned to extrinsic evidence, which indicated that the opportunity to invest in the national tour "belonged to the joint venture as the 'Co-Producer' of Book of Mormon." SFT Post-Hearing Br. 26.

Accordingly, the arbitrator had to parse hundreds of pages of financial records and hearing testimony to calculate the expenses SFT owed to TIC. *See, e.g.*, SFT Post-Hearing Br. 15–24 & n.21 (citing numerous exhibits and transcript excerpts). While TIC claimed $4.2 million in expenses, Berry ultimately arrived at a total of $98,847.[5] The reductions Berry made to TIC's figure appear to have been based on concessions Platt made during the hearing and evidence presented by SFT. *See, e.g.*, SFT Post-Hearing Br. 16 (arguing that Platt had already claimed all of the purported joint venture expenses on the tax returns for his own company); *id.* at 19 (challenging Platt's inclusion of $255,000 for future rent and utilities); *id.* at 20 n.21 (noting Platt's concession that $4,500 in Tony Awards tickets "doesn't belong"). Whether Berry erred in accepting SFT's arguments or in tallying the legitimate expenses is not this Court's concern. As TIC has provided no evidence of misconduct, the Court affords "strong deference" to the arbitrator's conclusions. *Porzig*, 497 F.3d at 138.

Third, TIC contends that it has a "contractual right to reimbursement of expenses prior to distributions being made," whereas the arbitrator construed TIC's priority payment as "inclusive" of expenses. TIC Br. 14–15. The Agreement reads, in relevant part:

> [A]ny distributions arising from such investment, whether from return of investment capital or investor net profits, shall be applied, first, to the payment of any out of pocket expenses incurred by the Joint Venture (other than those that Jon Platt would otherwise incur irrespective of this Agreement), and thereafter pro-rata pari passu to the Parties until they receive a full return of their Capital Contributions. Thereafter, all distributions based on investor net profits of a Production remaining after the payment of all Joint Venture expenses shall be paid

---

[5] TIC makes much of Berry's statement that she "*assumes* that $98,847 in expenses was properly attributed to the Joint Venture." August 11 Award § 1(a) (emphasis added). However, the extremely specific amount that Berry found as expenses—$98,847 rather than an even $100,000—undermines the suggestion that Berry ignored the mountain of evidence the parties had presented and picked a number at random. The Court therefore infers that the word "assumes," read in context, meant "concludes." Berry's poor choice of words as to this discrete point does not form a basis for vacating the award.

> 20% to TICorp, with the remaining 80% thereof divided pro rata pari passu between the Parties in accordance with their Capital Contributions.

Agreement § 3(b). Part of the arbitrator's award correctly applied this provision: Berry awarded TIC $98,847 in expenses *and* a priority payment on funds received through September 30, 2013. February 28 Award § 1(a); August 11 Award § 1(a). A later provision in the award does appear to contain a mistake: Berry orders that, going forward, TIC "shall continue to receive a 20% priority payment for as long as any distributions are made," but that priority payment will be "inclusive of" of any "ongoing expenses incurred." February 28 Award § 2(d); August 11 Award § 2(c). This part of the award appears to contravene the plain language of the Agreement, which states that the priority payment is to be deducted "after the payment of all Joint Venture expenses." Agreement § 3(b). But "an error—or even a serious error" does not by itself provide a basis for vacating an arbitration award. *Stolt-Nielsen S.A.*, 559 U.S. at 671. There is no indication that Berry deliberately rewrote the Agreement or engaged in any other misconduct. *See* 9 U.S.C. § 10(a). Berry was "arguably construing or applying the contract," *United Paperworkers Int'l Union*, 484 U.S. at 38; she simply misread or misinterpreted it in resolving this discrete and relatively minor issue. Because the award still "draws its essence" from the Agreement rather than merely "dispens[ing] [the arbitrator's] own brand of industrial justice," this error "does not suffice to overturn [her] decision." *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 85–86 (2d Cir. 2009) (citations omitted).

### E.   The Arbitrator's Appointment of a Receiver

TIC, finally, challenges the arbitrator's appointment of a person denominated as a "receiver." (Notwithstanding this label, the receiver's limited duties, which were reviewed above, are functionally more akin to those of a collection agent.) Neither party has identified legal authority that clearly authorizes or forbids an arbitrator's appointment of a receiver.

Counsel for each party conceded as much at argument. Tr. 13, 19. And the three-sentence arbitration clause in the Agreement is silent as to the arbitrator's authority to craft remedies. *See* Agreement § 7. Likewise, the FAA, the rules of the American Arbitration Association ("AAA"), and New York law do not specifically address whether arbitrators may appoint receivers.[6]

However, two principles are clear. First, under both federal and New York state law, the deference due to arbitration awards extends to the relief granted. Where "the arbitration clause does not include any limit on the arbitrators' powers to craft a remedy," the party seeking to vacate the award "must 'overcome a powerful presumption that the arbitral body acted within its powers.'" *Telenor Mobile Commc'ns AS v. Storm LLC*, 524 F. Supp. 2d 332, 359 (S.D.N.Y. 2007) *aff'd*, 584 F.3d 396 (2d Cir. 2009) (quoting *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier*, 508 F.2d 969, 976 (2d Cir. 1974)); *see also Synergy Gas Co. v. Sasso*, 853 F.2d 59, 64 (2d Cir. 1988) ("[W]hen it is contemplated that the arbitrator will determine remedies for contract violations, courts have no authority to disagree with the arbitrator's honest judgment in that respect.").

TIC cites out-of-state authority for the proposition that arbitrators may not appoint receivers. *See* TIC Br. 18. It goes without saying that a California court's interpretation of California law, and a New Jersey court's interpretation of New Jersey law, has no bearing on this Court's interpretation of federal law or New York law. Additionally, the cases TIC cites vacated

---

[6] TIC cites New York statutes that authorize *courts* to appoint receivers for the proposition that *arbitrators* may not appoint receivers. TIC Br. 19. However, these provisions do not directly address arbitration. TIC has a colorable argument that New York law prohibits arbitrators from placing corporations into receivership because the relevant statutory provision states that "[a] receiver of the property of a corporation can be appointed *only* by the court." *See* N.Y. Bus. Corp. Law § 1202 (emphasis added). But where, as here, the receiver serves as, in essence, a collection agent, the New York code does not contain similar language limiting, to the courts, the authority to appoint receivers. *See* N.Y. C.P.L.R. §§ 5228, 6401.

arbitral awards because the relevant state law did not affirmatively provide arbitrators with the authority to appoint receivers. *See Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C. v. Lowenstein Sandler, P.C.*, 365 N.J. Super. 241, 248 (App. Div. 2003) ("[N]either the contract nor the incorporated AAA rules expressly empowered [the arbitrator] to appoint a receiver."); *Marsch v. Williams*, 23 Cal. App. 4th 238, 245 (1994) ("[I]n appointing a receiver, the Panel acted without the benefit of any statutory authority empowering it to do so.").[7]  New York courts, by contrast, take the same, more permissive approach as federal courts to arbitration awards, and vacate such awards only where "the arbitrators violated an 'express limitation upon arbitral authority' or 'rewrote the contract.'" *In re Arbitration Between Coopertex, Inc. v. Rue De Reves, Inc.*, No. 89 Civ. 5748 (KMW), 1990 WL 6548, at *2 (S.D.N.Y. Jan. 22, 1990) (quoting *Local Union 1566, Int'l Bhd. of Elec. Workers v. Orange & Rockland Utils., Inc.*, 510 N.Y.S. 2d 671, 673 (1987)); *see also N.Y. City Transit Auth. v. Transp. Workers' Union of Am., Local 100, AFL-CIO*, 6 N.Y.3d 332, 336 (2005) ("Such an excess of power occurs only where the arbitrator's award violates a strong public policy, is irrational or clearly exceeds a specifically enumerated limitation on the arbitrator's power.").  Accordingly, when the applicable law does not clearly affirm or deny an arbitrator's authority to grant a particular remedy, courts should err on the side of deference to the arbitration award.  *Cf. Synergy Gas*, 853

---

[7] These cases are also distinguishable on the facts.  The New Jersey case involved an arbitrator's decision to place a corporation into receivership, "an act that usually deprives a corporation entirely of the ability to govern itself."  *Ravin*, 365 N.J. Super. at 252.  Similarly, the California case addressed an arbitration panel that had "appointed one of its members as receiver to supervise the sale of the [disputed] property and the dissolution of the partnership."  *Marsch*, 23 Cal. App. 4th at 242.  Here, the receiver was granted a far more limited role:  He will collect distributions from *The Book of Mormon* and allocate them to the parties in accordance with an established formula.  Accordingly, the cases on which TIC relies are both non-binding and inapt.

F.2d at 65 (affirming arbitrator's award of attorneys' fees because New York law "does not bar the award of attorney's fees; it merely does not grant authority to do so").

Second, arbitrators "enjoy broad discretion to create remedies," including forward-looking remedies.  *In re Arbitration Between Milllicom Int'l V N.V. & Motorola, Inc., Proempres Panama, S.A.*, No. 01 Civ. 2668 (SHS), 2002 WL 472042, at *6 (S.D.N.Y. Mar. 28, 2002).  Under the rules of the AAA, "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties."  Arbitration Rule 31.  Likewise under New York law, "an arbitrator is empowered to grant *any* relief reasonably fitting and necessary to a final determination of the matter submitted to him, including legal and equitable relief."  *Bd. of Educ. of Dover Union Free Sch. Dist. v. Dover-Wingdale Teachers' Ass'n*, 467 N.Y.S.2d 270, 273 (App. Div. 1983) *aff'd*, 61 N.Y.2d 913 (1984).  It is well established that, for example, arbitrators may award injunctive relief.  *See, e.g.*, *Yahoo! Inc. v. Microsoft Corp.*, 983 F. Supp. 2d 310, 316–17 (S.D.N.Y. 2013), *appeal withdrawn* (Jan. 2, 2014) (confirming an arbitration award that included injunctive relief); *Eyewonder, Inc. v. Abraham*, No. 08 Civ. 3579 (GBD), 2010 WL 3528882, at *4 (S.D.N.Y. Sept. 3, 2010) (same); *Grossman v. Ilowitz*, 898 N.Y.S.2d 621, 623 (App. Div. 2010) (collecting cases).  Appointing a receiver, like issuing an injunction, allows an arbitrator to order future action to prevent further disputes between the parties.  Both of those remedies are entirely consistent with the purpose of arbitration, "to definitively address a contentious issue without the delay, hassle, and expenditure associated with court proceedings."  *KX Reins. Co. v. Gen. Reins. Corp.*, No. 08 Civ. 7807 (SAS), 2008 WL 4904882, at *5 (S.D.N.Y. Nov. 14, 2008) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)).

Such forward-looking remedies run afoul of the *functus officio* doctrine only if the arbitrator reserves a future role for herself. *See Local 338, RWDSU v. Farmland Dairies, Inc.*, 89 F. App'x 748, 749 (2d Cir. 2003) (summary order) (noting the "'general rule [that] once an arbitration panel decides the submitted issues, it becomes *functus officio* and lacks any further power to act'" (quoting *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987)) (alteration in the original)); *see also, e.g.*, *KX Reins. Co.*, 2008 WL 4904882, at *2, *5 (vacating a "retention of jurisdiction" provision in an arbitration award). TIC is correct that Berry would have run afoul of this doctrine if she had "effectively install[ed] herself as a referee over further claims involving the receiver." TIC Br. 21. But she did no such thing. In her June 23 Award, she appointed a receiver, directed him to make future distributions in specified percentages, and stated that the Award reflected a "full settlement of all claims and counterclaim submitted to this Arbitration." Similarly, the August 11 Award, which Berry issued to resolve "some confusion on the part of the Parties," explained the narrowly limited role of the receiver and reiterated that the Award reflected a "full settlement of all claims and counterclaims." Neither award contains any suggestion that Berry will supervise the receiver or play some other ongoing role. If a dispute over the receiver's implementation of the award arises, the parties must take it up with this Court. *See NYP Holdings, Inc. v. Newspaper & Mail Deliveries' Union of N.Y. & Vicinity*, 485 F. Supp. 2d 416, 419 (S.D.N.Y. 2007).[8]

---

[8] Even if the arbitrator had exceeded her authority by appointing a receiver, that *ultra vires* act would not require the Court to vacate the entire award. *See Scandinavian Reins. Co.*, 668 F.3d at 71 (courts may "'confirm and/or vacate'" arbitration awards, "'either in whole or in part'" (quoting *D.H. Blair*, 462 F.3d at 104)). Instead, the Court would vacate only the portion of the award pertaining to the receiver. *See, e.g.*, *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 519 (2d Cir. 1991) (vacating part of an arbitration award that granted punitive damages as contrary to New York law); *KX Reins. Co.*, 2008 WL 4904882, at *2, *5 (vacating a "retention of jurisdiction" provision but confirming the balance of the arbitration award).

## CONCLUSION

For the foregoing reasons, SFT's petition to confirm the arbitration award is granted, and

TIC's cross-petition to vacate the award is denied.  The Clerk of Court is directed to terminate all

pending motions, and to close this case.


SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: December 2, 2014
       New York, New York

23